### UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| **CYA OIL & GAS INVESTMENTS, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | **2:12-cv-00212 JWS** |
| **vs.** ) | **ORDER AND OPINION** |
| **ISIS, LLC, *et al.*,** ) | **[Re: Motion at Docket 32]** |
| **Defendants.** ) | |

### I.  MOTION PRESENTED

At docket 32, defendants ISIS, LLC, *et al.* ("defendants") move to compel arbitration and dismiss the complaint or, alternatively, to stay the action.  Plaintiff CYA Oil & Gas Investments, LLC ("plaintiff" or "CYA") opposes the motion at docket 38. Defendants filed an untimely reply at docket 40.[1]  Oral argument was requested but would not assist the court.

_____

[1]LRCiv 7.2(c).  It is unnecessary for the court to consider defendants' untimely reply.

## II. BACKGROUND[2]

This lawsuit arises out of a failed oil and gas project in Oklahoma. CYA is a Texas limited liability company. Hung Simon Vo ("Simon Vo") was the representative of CYA. Based on discussions between Bobby Freeman ("Freeman"), who represented to have purchased ISIS, and Steve Hutchinson ("Hutchinson"), an officer of ISIS–and Simon Vo, CYA invested at least $655,000 in ISIS and later, Black Gold, LLC ("Black Gold"), during 2008 and 2009. Black Gold was created by Freeman in 2009 to insulate investors in ISIS from counterclaims against Freeman in a lawsuit against the original owners of ISIS. Freeman was the managing member of Black Gold.

Among the representations made to Simon Vo were that Freeman, through his ownership of ISIS, had production rights at three wells–the HFA #1, Adkins, and Yvonne wells–and that early investors could get a return of 25 times their investment. CYA maintains that Freeman represented to Simon Vo that combined expected revenue from all three wells would exceed $45 million in the first year of production. CYA claims that Freeman actually did not have production rights at any of the three wells. CYA also maintains that Freeman used investors' funds to make the down payment in the stock purchase agreement by which Freeman was to purchase ISIS and did not disclose that to investors.

Freeman replaced the independent operators of all three wells with his own company, Last Run, LLC ("Last Run"). Last Run shut down the Yvonne well approximately one month after operations began. CYA claims that the failure of the Yvonne well was not disclosed to CYA and that Last Run billed Black Gold approximately $1.4 million during the Yvonne well's month of operation. Last Run also had difficulties drilling at the other wells and production was dismal.

Black Gold considered a cash call from investors after funds dried up. In response, Black Gold's board requested an accounting. CYA states that Freeman

_____

[2]This background is taken largely from the order at docket 19.

could not provide a coherent accounting.  CYA maintains that in December 2010 Freeman hired an accounting firm to perform a preliminary review of Black Gold's accounting.  The firm concluded that Black Gold paid approximately $1.9 million directly to Freeman without invoices, that numerous expenses could not be tied to well-related work, and that over 50% of all expenses were not invoiced.  The preliminary review also concluded that Black Gold was approximately $900,000 in debt, but only received total revenues from all wells of $416,528.

CYA filed suit in federal court in January 2012.  CYA has asserted claims for breach of contract, breach of fiduciary duty, misrepresentation, securities fraud under Arizona law, federal securities fraud, rescission, and accounting, as well as a civil RICO claim.

The present motion turns on alleged agreements to arbitrate in the ISIS bylaws, the Black Gold Operating Agreement, the Black Gold-Last Run Joint Operating Agreement, and a settlement agreement between Black Gold, ISIS, and Last Run.  The ISIS bylaws contained an arbitration clause which provided as follows:

> The parties hereby agree that any dispute, claim, or controversy concerning this Agreement or the termination of this Agreement, or any dispute, claim or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement, shall be settled by arbitration . . . .[3]

The bylaws were signed by Bobby and Tammy Freeman and no other party.  Plaintiff has attached to its response a copy of the bylaws that was provided to it, dated January 2009, which contains no arbitration provision.

The Black Gold Operating Agreement also contained an arbitration clause.  It stated as follows:

> The Members hereby agree that any dispute, claim, or controversy concerning this Agreement or the termination of this Agreement, or any dispute, claim, or controversy arising out of or relating to any

---

[3]Doc. 32-2 at 19.

interpretation, construction, performance, or breach of this Agreement, shall be settled by binding arbitration . . . .[4]

The agreement was between the members of Black Gold and was signed by Christie Tran, Manager of CYA.[5]  It was dated April 22, 2009.

The Black Gold-Last Run Joint Operating Agreement contains an arbitration clause that is virtually identical to the arbitration clause in the Black Gold Operating Agreement.[6]  The settlement agreement, which purported to settle claims amongst the signatories (ISIS, Black Gold, and Last Run) arising from the Black Gold-Last Run Joint Operating Agreement, included a mediation/arbitration provision which provided that:

> In the event of any conflict, claim, or dispute between the [sic] relating to the purpose or subject matter of this Agreement , the parties shall mediate the dispute before a mediator selected by mutual agreement of the parties. . . . In the event that mediation is unsuccessful, the parties shall enter into binding arbitration.[7]

### III.  STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") allows a party "aggrieved by the alleged . . . refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."[8]  The FAA "establishes a strong federal policy in favor of the resolution of disputes through arbitration."[9]  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration

---

[4]Doc. 32-3 at 22.

[5]*Id.* at 4, 22.

[6]Doc. 32-4 at 55–56.

[7]Doc. 32-6 at 5.

[8]9 U.S.C. § 4.

[9]*Alexander v. Anthony Int'l*, 341 F.3d 256, 263 (3d Cir. 2003).

1  agreement has been signed."[10]  "The court's role under the Act is therefore limited to
2  determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether
3  the agreement encompasses the dispute at issue."[11]  "[A]s a matter of federal law, any
4  doubts concerning the scope of arbitrable issues should be resolved in favor of
5  arbitration, whether the problem at hand is construction of the contract language itself or
6  an allegation of waiver, delay, or a like defense to arbitrability."[12]

## IV.  DISCUSSION

**A.  Whether a Valid Agreement to Arbitrate Exists**

   **1.  ISIS Bylaws**

   Defendant maintains that plaintiff alleges in its complaint that it contracted for
membership in ISIS, that the ISIS bylaws state that ownership of a membership interest
is subject to compliance with the bylaws, and therefore that plaintiff bound itself to the
terms of the bylaws by accepting a membership interest.  Plaintiff, however, argues that
it never signed or agreed to the November 30, 2008 ISIS bylaws.  Plaintiff emphasizes
that only Bobby and Tammy Freeman signed the bylaws and that the only draft of the
bylaws that it received did not contain an arbitration provision.[13]

   Nonsignatories may be bound by an arbitration agreement "under ordinary
contract and agency principles."[14]  "Among these principles are '1) incorporation by
reference; 2) assumption; 3) agency; 4) veil-piercing/alter-ego; and 5) estoppel.'"[15]
Under the first principle, "[a] nonsignatory may compel arbitration against a party to an

---

[10]*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

[11]*Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th 2000).

[12]*Moses H. Cone Hosp. v. Mercury Constr.*, 460 U.S. 1, 24–25 (1983).

[13]Doc. 38-1.

[14]*Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006).

[15]*Id.* (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).

1  arbitration agreement when that party has entered into a separate contractual

2  relationship with the nonsignatory which incorporates the existing arbitration clause."[16]

3      However, because defendants have not provided any indication that plaintiff was

4  aware of the arbitration provision, and because plaintiff has produced evidence of an

5  agreement that did not contain an arbitration clause, the court is unable to conclude on

6  the record before it that the ISIS bylaws contained a valid agreement to arbitrate or that

7  CYA, as a nonsignatory, agreed to arbitrate via incorporation by reference.

8      **2.  The Black Gold Operating Agreement**

9      Plaintiff concedes that the Black Gold Operating Agreement constituted a valid

10  agreement to arbitrate.  It disputes that the clause covers the claims it has asserted

11  against defendants.

12      For the reasons discussed below, it is not necessary to determine whether the

13  joint operating agreement or the settlement agreement are valid agreements to arbitrate

14  under the FAA.

15  **B.  Whether the Arbitration Clause in the Operating Agreement Encompasses Plaintiff's Claims**

16

17      **1.  Securities Fraud & Misrepresentation Claims**

18      Defendants rely on *Prima Paint Corp. v. Flood & Conklin*,[17] which held

19  that–assuming a valid agreement to arbitrate claims arising out of the contract–federal

20  courts may adjudicate claims of fraud in the inducement of an arbitration clause itself,

21  but not claims of fraud in the inducement of the contract generally.  The latter are

22  subject to the arbitration clause.  Defendants argue that plaintiff's securities fraud claims

23  and misrepresentation claims are essentially claims of fraud in the inducement.

24  Defendants do not cite *Shearson/Am. Express v. McMahon*,[18] but it held specifically that

25

26      [16]*Thomson-CSF*, 64 F.3d at 777.

27      [17]388 U.S. 395, 403–04 (1967).

28      [18]482 U.S. 220, 238 (1987).

-6-

1   claims under the Exchange Act–and in particular, claims under Rule 10b-5–are subject

2   to arbitration provisions.

3          Plaintiff argues first that the arbitration clause in the Black Gold Operating

4   Agreement cannot apply to its claims concerning ISIS because, by the time the Black

5   Gold Operating Agreement was formed, plaintiff had already invested significant funds

6   in ISIS.  Plaintiff also argues that the operating agreement was dated April 22, 2009,

7   and that any claims arising before its effective date cannot be subject to the arbitration

8   clause.  Because plaintiff had already fully invested in both entities–ISIS and Black

9   Gold–by that time, plaintiff argues that none of its claims arising out of that investment

10  are subject to the arbitration provision, which operated prospectively.

11         The arbitration clause in *Prima Paint* stated as follows: "Any controversy or claim

12  arising out of or relating to this Agreement, or the breach thereof, shall be settled by

13  arbitration . . . ."[19]  Nonetheless, the Court held that it applied to a claim of fraud in the

14  inducement–consequently, a failure to specify that an arbitration clause applies

15  retroactively is immaterial here.  However, while those of plaintiff's securities fraud

16  claims arising out of its investment in Black Gold are subject to the arbitration provision,

17  those of plaintiff's claims arising out of its investment in ISIS–and those claims related to

18  that investment–are beyond its scope.  Similarly, plaintiff's misrepresentation claim is

19  subject to the arbitration clause in the operating agreement to the extent it arises out of

20  plaintiff's investment in Black Gold.

21         **2.  Rescission**

22         "[T]he rationale of *Prima Paint* extends to attempts to rescind contracts on other

23  grounds."[20]  Plaintiff seeks to rescind its investments in ISIS and Black Gold.[21]  To the

24

25

26         [19]*Prima Paint*, 388 U.S. at 398.

27         [20]*Three Valleys Mun. Water Dist. v. E.F Hutton Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991).

28         [21]Doc. 21 at 68.

Case 2:12-cv-00212-JWS   Document 41   Filed 08/13/12   Page 8 of 11

extent it seeks to rescind its investment in Black Gold, its claim is subject to the arbitration clause in the Black Gold Operating Agreement.

### 3. Breach of Contract

Plaintiff has asserted three claims for breach of contract: one based on Freeman's failure to pay commissions, one based on Black Gold's failure to fulfill its obligations under the operating agreement, and one based on dilution of plaintiff's shares in ISIS.  The claims based on failure to pay commissions in accordance with the Black Gold Operating Agreement and Black Gold's breach of that operating agreement are subject to the arbitration provision in the Black Gold Operating Agreement.

### 4. Accounting

Plaintiff's claim for an accounting pertains only to Black Gold.  It is therefore subject to the arbitration clause in the Black Gold Operating Agreement.

### 5. Breach of Fiduciary Duty

Plaintiff's complaint alleges that Freeman breached his fiduciary duties as both "managing member and holder of the controlling interest in Black Gold, and as solicitor of investors, seller of securities and holder of the controlling interests in ISIS."[22]  To the extent plaintiff's claim arises out of Freeman's role as managing member of Black Gold, it is subject to the arbitration provision in the operating agreement.[23]  To the extent it arises out of Freeman's controlling interest in ISIS, it is not.

### 6. Claims Involving Robert Popp and Lange, Poteet & Co.

Defendant argues that plaintiff's claim that ISIS and Black Gold's accountants breached contractual and fiduciary duties to plaintiff "arises out of or relates to the ISIS bylaws."[24]  However, the court has already concluded that the defendant has not

---

[22]Doc. 21 at 75.

[23]*See, e.g.*, *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983).

[24]Doc. 32 at 13.

-8-

1  demonstrated that the bylaws constituted a valid and enforceable agreement to
2  arbitrate.  The claims against the accountants are not subject to an enforceable
3  agreement to arbitrate.

4      **7. RICO**

5      Civil RICO[25] claims, in general, are arbitrable.[26]  Plaintiff's RICO claim alleges
6  that Freeman, Tammy Freeman, Freeman Properties, ISIS, Black Gold, Dan White, Ed
7  Sano, and Sabre Energy collectively represented a criminal enterprise that engaged in
8  mail and wire fraud.  On the one hand, the alleged enterprise is so broad that it appears
9  beyond the scope of the arbitration provision in the Black Gold Operating Agreement.
10  On the other hand, plaintiff specifically and repeatedly alleges that the Black Gold
11  investors were the victims.[27]  Because plaintiff's RICO claim is predicated on a "scheme
12  [to] raise money from the Black Gold investors" and "to defraud Black Gold investors,"[28]
13  the court concludes that it is subject to the arbitration provision in the Black Gold
14  Operating Agreement.

15  **C.  Waiver**

16      Plaintiff argues that defendants have waived the arbitration clause in the Black
17  Gold Operating Agreement.  Specifically, plaintiff maintains that by filing a lawsuit
18  against Simon Vo and another Black Gold member, defendants breached the arbitration
19  provision and may no longer rely on it.

20      In the Ninth Circuit, "a party arguing waiver of an arbitration provision bears a
21  heavy burden of proof, [because] waiver is not favored and any examination of whether
22  the right to compel arbitration has been waived must be conducted in light of the strong

23
24  ───────────────

25  [25]18 U.S.C. § 1961 *et seq.*

26  [26]*Shearson/Am. Express,* 482 U.S. at 242.

27  [27]*E.g.,* doc. 21 at 87, 88, 89.

28  [28]*Id.* at 90.

1   federal policy favoring enforcement of arbitration agreements."[29]  "A party seeking to
2   prove waiver of the right to arbitrate must show: (1) knowledge of an existing right to
3   compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the
4   party opposing arbitration from such inconsistent acts."[30]

5          The problem with plaintiff's argument is that, even assuming the first two
6   elements are met, plaintiff has not adequately demonstrated prejudice.  Neither the
7   slight delay nor minimal costs incurred at this stage of the litigation–defendants have not
8   yet answered the complaint–are sufficient.

9   **D.  Disposition of Claims**

10         In *Dean Witter Reynolds, Inc. v. Byrd*, the Supreme Court held that the FAA
11  "requires district courts to compel arbitration of pendent arbitrable claims when one of
12  the parties files a motion to compel, even where the result would be possibly inefficient
13  maintenance of separate proceedings in different forums."[31]  Because the court has
14  concluded that the arbitration provision in the Black Gold Operating Agreement is
15  effective, but the arbitration clause in the ISIS bylaws is not, plaintiff's individual claims
16  must be parsed, and the court must consider how to proceed on those claims that may
17  be litigated.

18         Section 3 of the FAA provides, in part, as follows:

19  If any suit or proceeding be brought in any of the courts of the United
    States upon any issue referable to arbitration under an agreement in
20  writing for such arbitration, the court in which such suit is pending, upon
    being satisfied that the issue involved in such suit or proceeding is
21  referable to arbitration under such an agreement, shall on application of
    one of the parties stay the trial of the action until such arbitration has been
22  had in accordance with the terms of the agreement.

23

24
   _____
25
   [29]*Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 934 (9th Cir. 2011) (internal quotations
26  and citation omitted).

27  [30]*Id.*

28  [31]470 U.S. at 219.

-10-

Here, plaintiff's claims are brought, at least in part, "upon [an] issue referable to arbitration." "[A] court can properly stay a suit before it if *any* issue in the suit is arbitrable, even if some issues are not."[32]   A district court may stay litigation involving non-arbitrating parties "as a matter of its discretion to control its docket."[33]   The same reasoning applies to non-arbitrable claims.  The court concludes that inefficiency will be minimized by staying this action while the parties arbitrate those of plaintiff's claims involving its investment in Black Gold.

## V.  CONCLUSION

For the reasons above, defendant's motion at docket 32 is **GRANTED** in part and **DENIED** in part as follows:

1) It is granted insofar as plaintiff's claims arising out of and related to its investment in Black Gold must be arbitrated pursuant to the arbitration clause in the Black Gold Operating Agreement, consistent with the discussion above.  Those claims are **DISMISSED**.

2) It is denied insofar as plaintiff's claims arising out of and related to its investment in ISIS are not subject to a valid agreement to arbitrate and with respect to all other claims.  Those claims are **STAYED** pending the outcome of arbitration.

**IT IS FURTHER ORDERED** the parties shall file a status report regarding the arbitration on the first business day of each month commencing with November 2012.

DATED this 10th day of August 2012.



/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[32] *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997).

[33] *Moses H. Cone*, 460 at 20 n.23.

-11-